**UNITED STATES v. GENERAL RUBBER CO.**

**GENERAL RUBBER CO. v. UNITED STATES.**

Customs Appeals Nos. 3800, 3801.

Court of Customs and Patent Appeals.
Oct. 30, 1934.

Joseph R. Jackson, Asst. Atty. Gen. (Daniel P. McDonald, Sp. Atty., of New York City, of counsel), for the United States.

Joseph F. Lockett, of Boston, Mass., and Arthur & Dry, of New York City (Paul H. Arthur and H. P. Sadtler, Jr., both of New York City, of counsel), and F. R. Wahl and Robert E. Sheldon, both of Akron, Ohio, for General Rubber Co.

Before GRAHAM, Presiding Judge, and BLAND, HATFIELD, GARRETT, and LENROOT, Associate Judges.

BLAND, Associate Judge.

These cases involve an appeal by the United States and a cross-appeal by the General Rubber Company (hereinafter referred to as importer) from a judgment of the United States Customs Court (Second Division), one judge dissenting, which sustained importer's protest against the assessment of duty of 7 cents per pound under paragraph 783, Tariff Act of 1930 (19 USCA § 1001 par. 783), on 193 bales of Egyptian cotton.

Paragraph 783 of the Tariff Act of 1930 is as follows: "Par. 783. Cotton having a staple of one and one-eighth inches or more in length, 7 cents per pound."

Cotton, except such as is provided for in said paragraph 783, is free of duty under paragraph 1662 (19 USCA § 1201, par. 1662) as "cotton, not specially provided for. * * * *"

The trial court held that the cotton in controversy had a staple shorter than one and one-eighth inches and that it should be reliquidated free of duty.

The cross-appeal of the importer is directed at questioning the correctness of the trial court's ruling as to the admission and exclusion of certain evidence, and in denying the motion of the importer for an order to set aside the submission of the case for the purpose of introducing newly discovered evidence.

The record consists of approximately 400 pages made up of the testimony of more than a dozen witnesses, and various papers, pamphlets, and documents admitted in evidence by the trial court.

Some attempt was made by the importer, through the testimony of one witness, to prove commercial designation, that is to say, that when Congress referred to "cotton having a staple of one and one-eighth inches," it did not have in mind cotton having a staple of any certain length in inches. On this phase of the case we think it is sufficient to say that

the weight of the evidence does not support such a conclusion. Three of importer's witnesses testified in substance that the term "cotton having a staple of one and one-eighth inches or more in length" means, in commerce, cotton like the official type of one and one-eighth inches staple. The disputed question in these cases is as to the proper method to be employed in the ascertainment of the staple length. Up to a certain point the importer and the government seem to be in agreement as to the steps to be taken in this ascertainment. It is not disputed but that in stapling raw cotton, a "pull" must first be made from the imported merchandise. There is no disagreement as to the steps to be taken or the method to be employed in making this pull, unless it may be said that the parties may be in some disagreement as to the proper atmospheric conditions which should obtain when the pull is made. The importer contends that if it is ascertained that the comparable staple of the imported cotton is shorter than that of the official type, then it must be concluded that the imported cotton is not cotton having a staple of one and one-eighth inches or more, and that in said ascertainment the use of a rule is not permissible, but it must be determined by a visual comparison only of the two pulls.

At page 16 of bulletin or document 41, issued by the Bureau of Markets of the Department of Agriculture, which was introduced in evidence, the following, with reference to pulling and measuring the staple of cotton, is found, under the heading "Detailed Description of Methods of Pulling Cotton":

"Grasp in the two hands a tuft of cotton of a size convenient for the purpose (about one-fourth of an ounce), holding it firmly between the thumb and forefinger of each hand, with the thumbs placed together, the fingers being turned in toward the palms of the hands, and the middle joints of the second, third, and fourth fingers of each hand touching the corresponding joints of the fingers of the other hand, so as to give a good leverage for breaking the cotton.

"Pull the cotton slowly apart with about the same leverage of each hand on the joints of the fingers, separating the tuft of cotton into two parts.

"Discard the part remaining in the right hand.

"Grasp with the thumb and forefinger of the right hand, the end of the tuft of the cotton retained in the left. The point of pressure on the cotton in the left hand is just be-low the joint of the thumb and at the nail joint of the forefinger.

"With the right hand draw a layer of fibers from the cotton held in the left hand.

"Retain in the right hand the layer so drawn.

"Repeat this operation four or five times, placing each successive layer directly over the fibers previously drawn, using care to see that the ends of all the layers are even with each other between the thumb and forefinger of the right hand.

"After discarding the cotton in the left hand, hold the fibers thus obtained between the thumb and forefinger of the right hand and smooth them with the thumb and forefinger of the left hand.

"Place these fibers on a flat horizontal surface with a black background.

"Block off the ends of the fibers with a cotton stapling rule, so as to indicate the length of the bulk, or body, of the fibers.

"Then measure the distance between the blocked-off ends.

"If preferred, the left hand may be substituted for the right and the right for the left, as the case may be, throughout the process here described. [Reference to plates omitted.]"

Each side agrees that the pulling which is required in determining the staple should be in accordance with the method above described. Some of importer's witnesses agree that the third sentence from the bottom, which refers to *blocking off the ends of the fibers,* is also applicable to the commercial method of stapling which, according to their contentions, is the proper method of stapling for customs purposes. They say, however, that the commercial method is to block it off with the eye. Importer's witnesses claim that the provision next to the last in the above quotation, which refers to *measuring* the distance between the blocked-off ends, is not complied with in commercial transactions and should not be observed in stapling for customs purposes.

There is no special provision of law which authorized the making of Treasury regulations with reference to the stapling of cotton such as is authorized with reference to grading wool, and no such regulations have been made by the Treasury Department. Under the Cotton Futures Act, passed in 1916 (39 Stat. 476, title 26, § 731 et seq. U. S. C. [26 USCA § 731 et seq.]), certain standards were to be submitted or provided by the Secretary

of Agriculture, the use of which was not compulsory in commercial transactions. Later, in 1923, the United States Cotton Standards Act (42 Stat. 1517, title 7, § 51 et seq. U. S. C. [7 USCA § 51 et seq.]) was passed, authorizing the Secretary of Agriculture to establish, from time to time, standards for the classification of cotton, which were the standards to be accepted for commercial purposes when cotton produced within the continental United States was involved. The standards established under the Cotton Futures Act were continued under the Cotton Standards Act with authority to make such changes as were required by the terms of the act. In the Cotton Standards Act, provision was made for the submission of cotton involved in commercial transactions to the Department of Agriculture for classification. Provision was made whereby the official cotton standards of the United States might be represented by "practical forms," and the Department of Agriculture was required to furnish copies thereof, upon request to interested parties. Under the authority of such act the Department of Agriculture, several years before the passage of the Tariff Act of 1930, kept and now keeps on hand, for the use of the trade, various samples of cotton of various staple lengths and grades, including uniform-sized, sealed packages of Department tested cotton having a staple of one and one-eighth inches in length, which length has been ascertained without regard to other characteristics of the cotton.

It is conclusively shown in the record that in all questions involving the staple length of cotton in commerce, except those which are based upon other standards agreed upon by the parties, the official United States types are used, and that the cotton in controversy in commercial transactions must be compared with and the staple determined by using the official types as a standard.

At this point it may be important to note that in neither the Cotton Standards Act nor in the Tariff Act of 1930 is there any requirement or suggestion that the official cotton types are to be used in any way in determining staple length for customs purposes.

As stated before, the importer insists that the use of the official types as the basis of comparison in determining the staple length for customs duty purposes is obligatory upon the customs officials, and that if it is ascertained by the use of the unaided eye that the imported cotton has a shorter staple than the official sample, it then falls within a staple length below the statutory requirement regardless of any actual measurement (with a rule or otherwise) of either the imported article or the official type.

The government contends that the staple length of the imported cotton must *measure* one and one-eighth inches or more regardless of the actual measurement of the official type, and that there is no legal requirement that the official standards shall in any way be employed in connection with the determination of the staple by the customs officials. The testimony of the government's witnesses and the contentions of government counsel, however, raise no question as to the accuracy of the staple measurement in said official types. Government counsel did refuse to concede that the official type was one and one-eighth inches in length, but the government proved by its witness Buffington that if the official type in controversy was pulled under conditions of relative humidity of 65 per cent. and a temperature of 70 degrees Fahrenheit, it would pull a staple of one and one-eighth inches. As we understand the position of government counsel in respect to this phase of the case, it is to the effect that while the government does not question the accuracy of the official types, and while it has proven that if the staple of such official types is determined under proper conditions it will pull one and one-eighth inches, and even if it were shown that the staple of the official type was less than one and one-eighth inches in length, the imported article must nevertheless actually measure in accordance with the requirement of the terms of the tariff act. In other words, the government does not question the accuracy of the Department of Agriculture types, but claims the determination of the staple at the port of entry can in no way be influenced by any inaccuracy which might exist in the official types.

The gist of the contention of the government is that no matter whether one uses the official type in connection with the determination of the staple length of the imported cotton or not, an actual measurement of the staple must be made by the customs officials, and that Congress by the use of the term in controversy had a definite measurement of the staple in mind. Therefore, the chief issue involved in this case, concerning which most of the witnesses have testified fully, is whether or not in determining the length of staple the actual length of some portion of a pull of cotton should or should not be determined by the use of a rule.

Importer's argument is mainly to the effect that Congress, by the use of the term "cotton having a staple of one and one-eighth inches or more," had in mind cotton which

in trade and commerce of the United States responded to that term when the staple was ascertained by the ordinary commercial method employed, and that in such trade and commerce the rule was rarely used; it being the almost uniform practice to determine the length of staple of cotton in controversy by an eye comparison with the official type.

In the trial below, the importer's position there and here was briefly and clearly stated as follows:

"The Plaintiff's witnesses will testify that no two persons will often agree as to where to begin measuring these bundles of fibre with a rule, and where to end. Whereas under the familiar laboratory and scientific principle, that a variable should be compared with a variable, it is quite easy to compare one of these bundles of fibres with a similar bundle of fibres likewise arranged, and the result will be accurate and reliable.

"I might add that the evidence will also show that an expert can deliberately pull cotton either long or short, and if then he proceeds to pull cotton of known and recognized length of staple, another expert can detect whether his pull is made in the same way, whereas if the rule is applied, the result will be false and misleading.

"For these reasons, these are the facts upon which the plaintiff bases its case, that the commercial practice requires the comparison of two such pulls, one unknown cotton with a pull of known and recognized staple."

█ Aside from the question of the degree of temperature and humidity under which the operation of stapling was performed, the question of the propriety of the use of the rule seems to be the all-important and controlling question in this case. The cotton having been classified as having a staple of one and one-eighth inches or more, the importer, in order to sustain its protest, was under the burden of showing that the classification was wrong and that the imported cotton was not of the staple of one and one-eighth inches or more in length. Since it contends that the assessment was wrong because the wrong method was used, which method brought about inaccurate results, we think the importer is required not only to show that the method employed in the classification was wrong and brought about inaccuracies to its detriment, but that the methods employed by importer's witnesses were proper and produced the result claimed.

At first blush it would seem that the decision of the issue involved in this case would require that the court first arrive at a definite definition of the term "cotton having a staple of one and one-eighth inches or more." After most careful consideration, we are of the opinion, as the issue is presented here, that it will not be necessary to lay down such a definition since the parties are not in disagreement as to the quantity of fibers one and one-eighth inches or more in length which must be found in the pull in order to bring it within the terms of the tariff paragraph. While a definition of the term "staple length" is not required as the issue is presented here, the views of the various witnesses and the expressions of some of the authorities on that question may be helpful in considering the testimony as a whole. The witnesses and the printed authorities are in hopeless disagreement on this subject.

Morse Bros., Inc., v. United States, 13 Cust. App. 553, T. D. 41432, involved the determination of whether or not certain cotton cloth was in chief value of the kind of cotton provided for in paragraph 16 section 1 of the Emergency Tariff Act of May 27, 1921 (42 Stat. 10), in which paragraph was the provision "cotton having a staple of one and three-eighths inches or more in length." One of the issues there presented was whether or not the fibers of one and three-eighths inches or more predominated over the shorter fibers. Upon that record we held, confining ourselves to the issue as presented, that the short fibers predominated over the longer fibers and that the cloth was not in chief value of cotton such as was provided for in said paragraph 16. Notwithstanding the fact that that was a case involving the determination of the staple length of cotton found in the cloth (and not in raw cotton), its applicability to the facts at bar would seem apparent if the proof which was controlling there would be applicable and controlling here. We there only decided the issue as it was presented to us, and in view of the narrowness of the issue there presented we do not feel that what we said there should in any way be controlling of the decision of the issue at bar. It is agreed here by both parties to the litigation that if fibers one and one-eighth inches or longer had to predominate over all other fibers of all lengths before cotton could be said to be of a staple of one and one-eighth inches, there would be no cotton of that staple on account of the great number of short fibers in all cotton.

Only three of all the witnesses who testified in the case at bar were asked to define staple and the definitions given by them differ materially.

Importer's witness Wilbert H. Morrison was asked what he understood to be the meaning of the "staple of cotton." He stated that it was the "bulk or opaque mass resulting from commercial pulling operation" and that it was the length of this mass which had to be determined. He stated that he blocked off and did not count the jagged ends which would be the ends of the longest fibers.

W. J. Britton, importer's witness, was closely questioned by the court below and by counsel in the case as to his understanding of the term "staple," and pertinent portions of his testimony were as follows:

"*The Witness:* It does not mean exactly an average, but it means that that tuft of cotton which is left in your hands, after you have proceeded to go through with your regular process of elimination and discard, until you arrive at that tuft which you consider to be the staple, because the ends are not irregular, the cotton has gotten down to a mat which shows that it contains the *longest proportionate fibres* in that cotton. You don't get the shortest and you don't get the longest, but you get the *longest proportionate fibres* in the cotton. [Italics ours.] * * *

"X Q. Could it be said that the preponderating fibres consist of those of a certain length, which exceed any number of other lengths? A. It might be said that, and then again it might be said that *the preponderating fibre was the preponderating fibre of some one given length.* I should say that in the staple, in the ultimate conception of the staple which you might say, that the staple of the pull of cotton was *the longest preponderating fibre of any given length* in the pull. I believe in the segregation of the fibres of the cotton, you would naturally wind up with that result.

"X Q. *Then I take it you mean the preponderating fibre is those fibres of a certain length which exceed any other fibres of a given length?* A. *Of a given length.* [Italics ours.]"

From statements made by counsel in oral argument here they seem to be in agreement that Mr. Britton's definition is substantially correct.

One of the government's witnesses, E. F. Buffington, stated that "staple" meant *the length of most frequency which is called the bulk of the fibers in the completed pull,* and that "Staple, it is the *average length* of the fibre contained in the pull." [Italics ours.] It is clear to us that the average length of the fibers in a pull is not the same thing as

was described in the above-quoted testimony of witness Britton.

The Department of Agriculture has attempted to define "staple," and in the Service and Regulatory Announcements 41, supra, at page 4, over the signature of the Secretary of Agriculture, the following is found: "Section 1. The length of staple of any cotton shall be *the normal length by measurement without regard to quality or value, of a typical portion of its fibers* under a relative humidity of the atmosphere of 65 per cent and a temperature of 70° F." [Italics ours.]

It seems to us that the meaning of the term "normal length * * * of a typical portion" is little, if any, clearer than the term "length of staple" which was being defined.

So, it will be seen that the government contends that *measuring* should begin at the blocked-off ends, and the importer contends that *estimating* should begin at the same place. There is no explanation in the record, or elsewhere found by us, just why one begins *measurement* or *estimation* at that particular point. Whether the beginning of the opaque mass is the beginning of the fibers of "average" length or of fibers of "normal" length of a "typical portion," or of fibers of greater frequency, or of the fibers predominating over all other fibers, or of the fibers predominating over any other class of fibers, is not shown by this record, and in view of the fact that there is no disagreement as to the place of starting, it is unnecessary for this court to attempt to do what those most concerned with the question seem not to have satisfactorily done.

Now, in view of the foregoing considerations, it seems to us that the decision of the issue at bar rests in determining whether or not the use of a rule in measuring the distance between the blocked-off ends was calculated to produce and did produce incorrect results in the stapling of the cotton in controversy, and whether or not the proof offered by the importer of the commercial method in which the eye alone is used to estimate the length of the staple shows the incorrectness of the method employed by the customs officials and the witnesses of the government in this case.

Obviously, whether the rule is used to measure or the eye is used to estimate, the length of the cotton between the blocked-off ends must be ascertained. It would seem clear that if the witnesses on both sides of this case are correct in their determination of

the portion of the pull to disregard (the blocked-off ends), the distance between the blocked-off ends is the length of the staple. Since both sides agree that the uneven ends should be disregarded, it is difficult to understand how it may be logically claimed that applying the rule in measuring the distance between the blocked-off ends can produce an inaccurate result. It is our view that any estimation or comparison of the portion which lies between the blocked-off ends which produces a result different from actual measurement would be an incorrect result.

After reading this record, we have but little doubt that in commercial transactions the rule is not used except in close or controverted cases, and that for such commercial purposes a visual comparison of a pull made from the cotton in controversy and a pull made by the same method, under the same conditions, of the official standard would be of sufficient accuracy as to ordinarily go unquestioned. But such a conclusion does not suggest that the use of the rule in the ascertainment of an exact length in close cases produces an inaccuracy.

Something has been said on both sides of the case about the bias or interest of the witnesses, it being pointed out that certain of the importer's witnesses have pending litigation involving the issue at bar and that two of the government's witnesses have applications on file for positions in the government service and two others were in the government service at the date of trial. The witnesses on both sides seem to us to be men of a very high character, and a reading of the testimony on both sides produces the impression that the witnesses have honestly stated their views on this very highly technical and confusing question.

There is considerable uniformity of opinion among the witnesses on both sides that a cotton puller can pull the staple short or long. It is contended by the importer that if the cotton of the official standard and the cotton in controversy are both pulled by the same puller, he will pull them both alike, and that it makes no difference whether he pulls long or pulls short. It is suggested that pulling short removes too many of the longer fibers from the cotton, and that pulling long leaves too many of the extra long fibers in the pull. We have found no contention here by the importer that the pulls made by the witnesses for the government were made too long. Some of such pulls were made in the presence of importer's counsel in the trial of this case. On the contrary, one of the government's witnesses withstood successfully what has been denominated as being in the nature of a "blindfold" test. At the trial he made pulls and measurements of certain official types of cotton of certain designated lengths (which designated lengths were at the time unknown to him), which measurements, made with a rule, tallied exactly with the measurements he had made previously, and concerning which he gave testimony at the trial. His accuracy in such measurements prompted a voluntary admission by importer's able counsel of the accuracy of the test of this witness.

This record shows that the original official standards of the Department of Agriculture, made before it had any cotton of any definite standards with which to make comparison, were made with the use of a rule. It is difficult to understand how, if the original standards were made with the use of a rule, the measurement with a rule of the staple of the imported cotton in the case at bar would lead to more inaccuracy than would a comparison or estimation by the eye. Two of the witnesses who testified for the government were concerned with the establishment and making of the original standards and stated that they were made by the use of the rule.

The government does not urge that the rule be used in cases where it is obvious that the proper measurable portion of the pull of the cotton to be stapled is shorter than the standard in question, but does contend that in close or doubtful cases the rule should be used in order to insure accuracy. It is fair to conclude from the testimony of all the witnesses that the imported cotton is close to the border line and that such a condition calls for accurate measurement. Of course, in arriving at this conclusion we have left out of consideration any question of commercial designation. Whether the term used in the tariff statute is subject to proof of commercial meaning differing from the common meaning is not decided by us, since it is clear, as we see it, that this record affords no such proof.

It is urged by the government with great earnestness that there is one fatal defect in the importer's proof which is controlling in the case. It is pointed out that the proof is uniform that differences in temperature and humidity may affect the length of staple in cotton as much as one thirty-second of an inch. It is pointed out that the spirality of the fiber of cotton affects its length, and that by reason of such spirality, moisture and temperature may cause a variation of one thirty-second of an inch in actual measurement. This fact is shown in the record not only by

the testimony of the witnesses, but in the bulletins promulgated by the Department of Agriculture, which were introduced into the record. The tests made by the government's witnesses were made at a relative atmospheric humidity of 65 per cent. and at a temperature of 70 degrees Fahrenheit. That these are the proper conditions under which the determination of the staple length should be made is not disputed. While all of importer's witnesses who testified on the question state that the length of the staple in the cotton from the official standards and in the imported cotton were both determined at the same time and place, it is not shown that they were estimated while under the above recommended conditions. Professor George B. Haven, who did not employ the so-called commercial method used by importer's other witnesses, did say that his test was made after exposing the "small bundle of fibres" analyzed, for a period of from two to four hours to a "moving atmosphere of standard properties, 70 degrees Fahrenheit, and 65 per cent. relative humidity."

Government counsel, agreeable to the conclusion of the dissenting opinion of the trial court, urges that the importer made no effort to show whether the government standard type used was kept for any length of time in the same temperature and under the same atmospheric conditions as the exhibits taken from the imported cotton. While it is unnecessary for this court to base its decision on this phase of the case alone, in view of the other considerations to which attention has been called, it does seem that the conditions under which the tests were made by importer's witnesses, to say the least, were not calculated to bring about as accurate a result as were the conditions under which the tests were made by the government witnesses. Certainly this fact does not have the tendency of strengthening the importer's contention that its estimation was more correct than that of the government.

▮ The trial court, in arriving at its decision, gave great weight to the testimony of Professor Haven as being corroborative of the testimony of the importer's five other witnesses, and states that he made actual measurement of the fibers in the samples and that his determination of the length of the staple must be considered more accurate and reliable than the method used by the government's witnesses. We are of the opinion that Professor Haven's testimony does not show that he made actual measurement of the staple of the imported cotton, although the record shows that he did ascertain by actual measurement the lengths of all the fibers in a given amount of such cotton (not in a "pull" of cotton).

It must be remembered that the five so-called "commercial witnesses" of the importer employed what they termed the "commercial method" or "comparative method" of determining the staple of the imported cotton. The so-called "comparative method" involved estimating rather than measuring after pulls had been made. These five witnesses qualified as experts in cotton stapling. Professor Haven's testimony was not offered as being that of an expert in stapling cotton. His test was a laboratory test, and importer's counsel states that it was not offered as showing the commercial practice but as "scientific confirmation of the actual results of the stapling by the commercial witnesses," and that it was also offered as a more accurate and scientific method than rule measurement, and also for the purpose of showing that the length of staple was not determined from "preponderating fibers" emphasized in the Morse Bros., Inc. Case, supra.

Professor Haven did not take a pull of cotton nor did he make any pull of any kind. He states that for the purpose of sorting the fibers into lengths and paralleling them so as to afford the opportunity of estimation or measurement, he used a Webb-Suter Duplex Cotton Sorter. A quantity of the imported cotton, some from each of the ten bags representing the importation, was taken in small bunches, blended in the fingers, and placed in said machine, where it was combed, parallelized, stapled, and mounted on black velvet, under glass. These fibers which were mounted, however, were not the fibers of a pull, which, according to the contentions of both parties here, must be made, but, as we understand it, were all the fibers of a given amount of cotton taken from the importation.

Professor Haven made in this manner what he calls "arrays" from each of the ten exhibits representing the importation in controversy. These arrays consist of all the fibers in a given amount of cotton paralleled and thinly spread on black velvet. One end of all the fibers is placed on a common base line, the longest fibers being placed at the extreme left end and there being a graduation in length towards the right end where the shortest fibers are. The fibers of the arrays were divided into groups in accordance with their length, and the lengths of the groups varied one-sixteenth of an inch. Each group of fibers was then weighed. The percentage of this weight to the percentage of the weight of the entire array was then ascertained. The fibers

were not counted, but it is stated by the witness that the comparisons of their weight would determine and did determine the relative amount of fibers. Arrays and charts made from the imported merchandise, and arrays and charts of the official type, similarly made, were compared. Each chart, ten in number, shows a graph representing an array, made as above described, of the ten exhibits representing the imported cotton, and a graph made of the official type of cotton, the graph of the imported cotton being superimposed, so to speak, on the graph of the official type cotton. Most of these charts show that throughout the entire array from the longest fiber to the shortest the columns representing the imported cotton are shorter than the columns representing the official type. In at least two of such charts this is obviously not true.

From his tests, Professor Haven states very positively that the fibers throughout the entire array of the imported cotton are shorter than the fibers of the official type. He does not state the staple length of the imported cotton, nor does he state anywhere that the staple of the imported cotton is not one and one-eighth inches or more. In other words, his testimony is to the effect that he has demonstrated with machine and mathematical accuracy, that the conclusions reached by importer's other witnesses that the staple of the imported cotton is shorter than that of the official type, were correct. It probably should be noted here that importer's commercial witnesses did not undertake to say that the fibers of the imported cotton *throughout the entire array* were shorter than the official type, but they did say that by pulling and estimating they determined that the staple of the imported cotton was shorter than the one and one-eighth inches official type.

It would seem, therefore, that even if it could be said that Professor Haven's method and the calculations made under it tended to verify the conclusions reached by the importer's other witnesses, it does not follow that his testimony is probative of the issue here, to wit, was the collector wrong in his determination that the cotton was of a staple of one and one-eighth inches or more.

In view of the foregoing considerations we are of the opinion that the importer has not sustained the burden placed upon it of proving that the imported cotton did not have a staple length of one and one-eighth inches or more.

The General Rubber Company, importer, in its cross-appeal, has made four assignments of error as follows:

"1. In sustaining certain objections by the United States to the introduction of evidence offered by the Appellant (Plaintiff below). (Pages 35, 51, 126, 157, 238 (2), 245 (2), 273, 276, and 461 of the Typewritten Record.)

"2. In not sustaining certain objections of the Appellant (Plaintiff below) to the introduction of evidence offered by the United States. (Pages 66, 71, 80, 197, 363, 364, 367 (2), 378, 383, 389, 391, 398, 404 and 405 of the Typewritten Record.)

"3. In denying the motion of the Appellant (Plaintiff below) to strike from the record certain portions of an answer given by Witness Neal who testified for the United States. (Page 433 of the Typewritten Record.)

"4. In denying on June 29, 1933, the motion of the appellant (General Rubber Company) for an order to set aside the submission of the case and restore it to the docket."

The first two assignments are too general in character and are not sufficiently specific to comply with the requirements of law, and we hold that no question for our decision is presented by them. See Corpus Juris, vol. 3, p. 1370, § 1519(e). We have examined the record with care with reference to the third and fourth assignments, and we find that no prejudicial error was committed by the court in connection with the subject-matter referred to in said assignments, and that such action as the court took in the instances referred to in said assignments of error 3 and 4 was entirely within its discretion.

We are of the opinion that the protest in this case should have been overruled by the trial court, and its judgment is reversed.

Reversed.